
RECEIVED

AUG 1 8 2014

CLERK, U.S. DISTRICT COURT
ANCHORAGE, A.K.

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

Michael Mendenhall,

              Petitioner,

  vs

D. MILLER,

             RESPONDENT.     CASE NO. 3:14-cv-00001-RRB

===============================================================

## CERTIFICATE OF APPEALABILITY

A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 USCS § 2253(c)(2). The substantial showing threshold is satisfied when a petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). When a prisoner's petition is denied on procedural grounds, a certificate of appealability "should issue...if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 provides: Where constitutional rights are involved, no rule-making or legislation can abrogate them.

U.S. CONST. art. III have a responsibility to grant habeas relief if Supreme Court precedent has been unreasonably applied.

1 of 33

Doody v. Ryan, 649 F.3d 986.

In this instant case, at least seven state superior court judges have proven to be far less than impartial because of the extreme biased accusation. Judge Beistline, being a former state superior court judge for the STATE OF ALASKA, fits into this category to protect his colleagues.

In United States v. Maness, 2006 U.S. Dist. LEXIS 39194 provides to be most damaging to Beistline's reputation as a judge. The defendant in this case made an accusation——"In his motion, Maness sets out two grounds which he contends require recusal. First, he asserts that Judge Beistline must have had an ex parte communication about Maness with Alaska Superior Court Judge John Suddock...second, he asserts Judge Beistline's possible involvement with a child molestation/pornography ring, a ring Maness says involves several people he identifies by name and which he says specializes in "particularly perverted illegal pornograph that involves rape, torture, bestiality and more" and Maness' own letter to the Church of Jesus Christ of Latter Day Saints which says that there is undisputable evidence that Mr. Beistline is a coddler of child molesters." [Accusation made by police officer, no one else involved.]

Mr. Mendenhall had submitted a motion of reservation of rights under the  Uniform Commercial Code 1-308.

Prosecution in this case against Mendenhall had made a motion not to allow Mendenhall (defense) to use the UCC in his defense just at the start of the state jury trial.

If a court denied a petitioner's petition, the court may only issue  a certificate  of  appealability  when a  petitioner  makes

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 2 of 35

a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that), the petitioner should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)(quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983).

The original arrest warrant proves invalid in that the state citation became obsolete as of July 1, 2012. Arrest was made on November 13, 2012——approximately four and one half months after the new citation of state law became effective. See Ground 1.

For a crime to exist under the American common law, there must be an injured party. In other words, when someone is charged with a crime under the common law, there must be an injured party and a sworn complaint by the injured party. If you believe differently, show all proof. In this case, only an accusation was made by an Anchorage police officer after stalking, cyber-spying, electronic surveillance the Petitioner for approximately eleven months from December 6, 2011 to October 28, 2012. See Affidavit of Detective James ESTES, Anchorage Police Officer.

Mr. Mendenhall had submitted a motion to dismiss based on lacking corpus delicti and jurisdiction in which state judge Michael R. SPAAN had sat on without informing the status his ruling until Mendenhall had inquired about it after a few months.

3 of _33_

It is unlawful for the STATE OF ALASKA, as PLAINTIFF, to participate as an injured party. A legitimate PLAINTIFF was not produced by prosecution in this case against Mr. Mendenhall.

Even during the grand jury proceeding the prosecutor could not or would not admit that there was no injured party in this case against Mr. Mendenhall.

Following are twelve grounds Mr. Mendenhall will again present to the federal court.

Ground 1. CONVICTION OBTAINED BY WRONGFUL ARREST AND CHARGE
The charge in this matter ("case") is false and does not apply. First, the citation is outdated on the arrest warrant. Second, when someone is charged with a crime under the common law (common law jurisdiction was used during the trial) there must be an injured party. Only an accusation was made by an Anchorage police officer. There are no other person involved in this case. Judge Michael R. SPAAN had made a judicial determination that the PLAINTIFF, STATE OF ALASKA, who is bringing charges against the Peititoner, is not an injured party. Effective date of citation change July 1, 2012.

Ground 2. CONVICTION OBTAINED BY USE OF EVIDENCE GAINED
PURSUANT TO AN UNCONSTITUTIONAL SEARCH AND SEIZURE
On 11/13/12, the Anchorage Police Department invaded the Petitioner's Palmer, Alaska residence without showing or giving him, or anyone else living at the residence, the search warrant. The Petitioner was taken from his residence to a police vehicle for interrogation. A reliable witness, living at the residence, was being questioned by law officials and observing them conducting an exploratory search and seizure and writing down items to be seized. At least three APD officers admitted in their police reports to conducting

Case 3:14-cv-00001-RRB  Document 7  Filed 08/18/14  Page 4 of 35

the exploratory search and seizure then leaving a copy of the search warrant and their itemized list of what they had seized, <u>after the seach was completed</u>.

REPORT OF TAMMY DUNN, in part:

"On 11-13-12...I was assigned to take photographs at the scene and act as Evidence Custodian...At about 1915 hours I began taking exterior photographs of the residence and surrounding area...I continued taking photographs as I entered the residence, which had a living area connected to a kitchen. There was a hallway with a master bedroom directly at the end, where Sgt. COUTURIER was speaking with N. Thomas. Looking down the hallway from the living room, there was a room to the left and bathroom on the right...Sgt. COUTURIER finished speaking with N. Thomas and I was able to take overall photographs of the master bedroom area. As Alaska State Troopers (AST) JORGENSEN and SHANIGAN began searching the computer desk room, I took photographs of specific items they located. AST JORGENSEN located a second black computer tower inside the lower left desk cabinet door and a webcam that was hanging behind the monitor on the desk...I was informed the search was completed and took overall photographs agains of the interior of the residence and the copies of the seach warrant paperwork left with N. Thomas. At about 2025 hours, we left the residence..." The question of taking photographs during a search and seizure is in question.

REPORT OF MICHAEL COUTURIER, in part:

"On 11-13-12 I supervised a residential search warrant service and an arrest warrant service...I assigned Det. ESTES and Det.

5 of 33

THOMAS to Mendenhall...for interviewing and they moved him to
their vehicle for interviewing. I supervised the remainder of
the residential search warrant...We gave Thomas a copy of the
residential search warrant and a copy of the property and evidence
form that itemized what we seized. We drove away...at about 2040
hours."

REPORT OF MARK THOMAS, in part:

"On November 14 (sic), 2012 I attended a search warrant briefing
in the Cyber Crimes United put on by Det. ESTES. The search
warrant was for a residence in Palmer...Det. ESTES also had an
arrest warrant for an individual...I then went in the house and
assisted with the seach...There were several animals in the house
all of which were being watched by Nora. I searched the master
bedroom with AST INV. SHANNIGAN. I found a samsung ditigal camera,
which was identified as belonging to Nora. Det. ESTES reviewed
the images on the camera and decided to leave it in the apartment.
Nora identified which phone belonged to Michael. His phone was
in the livingroom and was not seized. No other digital media
itmes were found in the master bedroom. AST INVESTIGATORS were
working in the computer room and ultimately removed two tower
computers and a webcamera. The search was completed at about
2022 hours at which time we're leaving the residence. We arrived
back at APD at 2117 hours at which time we locked the evidence
items up in the CCU unit."

When inquired about the seach and seizure process done by
law enforcement officials, the judge had played ignorance of
the procdures. (end)

6 of _33_

Ground 3.  CONVICTION OBTAINED BY UNFAIR JURY TRIAL

On June 24, 2013, trial commenced.  The accused represented himself.
Upon jury selection Petitioner and prosecution were asked by the
trial judge how many alternates should be selected, prosecutor
said one, the Petitioner said two.  Judge said there will be two
alternates.  Defense preempted three potential jurors.  The last
potential juror had been preempted, but the judge did not notice
it.  The judge then walked toward the jury panel and declared:
"WE HAVE A JURY!"  The jurors then left the court room.  Petitioner
then informed the judge that the last potential juror was preempted,
the person was called back in time and was told she was dismissed
as a juror.  Because the selected jurors were dismissed for the
day, the judge and prosecutor, without the defendant, decided
that one of the two alternates will be the 12th juror.  By eliminating
one of the two alternates, the judge ignored his judicial determina-
tion that there will be two alternates during the trial, thus,
jury  tampering is in evidence.  Only eleven challenges were
allowed by  the judge in picking the 12 jurors from at least
61+ potential jurors.

The prosecutor, at the start of the trial, had motioned  the
court not to allow the Uniform Commercial Code be used by the
defendant in his defense, the judge agreed; thus, full force and
effect of the system of law that the State operates under was
taken away from the defense by the court.  Defense objected to
his judicial determination.

The judge was asked:  "Your honor, let me see if I understand
you correctly, are you telling me that sections 1-308 and 1-103

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 7 of 35

of the UCC are not valid in this court?" The judge acknowledged
by answering "YES". Defendant replied: "I put this court on
notice that I am appealing your judicial determination."

The only witness, James ESTES, had become hostile when the
defendant started questioning him and had told the judge he had
no further questions of this hostile witness. The prosecutor
told the court in her opening statement that she had other witnesses
to testify. No other witnesses against the defendant was presented,
but James ESTES. When this was said by the prosecutor she looked
straight at the Petitioner. No injured party present.

The judge came over to the Petitioner and asked if he wanted
to do his opening statement after the prosecutor, he advised and
said it will be allowed later "after" the "evidence" was presented
by prosecution. This was not done as the judge advised.

The defense had objected to all the information used as
evidence during the prosecution's presentation of this illegally
obtained information by APD officer James ESTES obtained over
an eleven month period.

Defense had informed the judge there was a witness for the
defense to testify about the APD's search and seizure. The judge
played ignorance of the proper search and seizure procedure done
by law officers. Since the defense's witness was not there, the
judge told him that the witness would be allowed to testify on
September 26, 2013 at 2:00 PM.

The judge had a side bar conversation asking the Petitioner
if he was going to testify, the Petitioner said "No." That was
done outside the courtroom. During this side bar, the police

officer abruptly interferred Petitioner talking with the judge
and told the Petitioner to stop moving backwards in an aggressive
tone of voice.  Petitioner did not realize he was doing that
while talking with the judge.  The court did not follow normal
court procedures.

Ground 4.    CONVICTION OBTAINED BY USE OF ILLEGALLY OBTAINED
             EVIDENCE

The information used as evidence had been illegally obtained  by
the Anchorage Police Department (APD), mainly Detective James
ESTES.  He admits in his sworn affidavit that he was "stalking";
"cyber-spying"; "electronic surveillance" the accused from between
December 6, 2011 and October 28, 2012."  During the evidentiary
hearing, prosecution coached ESTES into altering his affidavit
changing the October 28, 2012 date to November 10, 2012.  The
accused did not know who he had been chatting with because there
are so many fake ID's and accounts on the www.internet services.
James ESTES is one of those.

     The Petitioner was residing in the MAT-SU valley, i.e., in
Wasilla and Palmer, Alaska during these dates, outside the
geographical jurisdiction of the Anchorage Police Department.
Wasilla and Palmer have their own police departments.

     This illegally obtained evidence use had been objected to
by the defense while being used by prosecution during the trial.

     APD officer ESTES got the Petitioner's accounts from GCI and
YAHOO without his knowledge.  Probable cause for the warrants were
under false pretenses.  See James ESTES' affidavit.  Hacking on
the internet is unlawful by all; this includes law officials.

9 of 33

Ground 5.   CONVICTION OBTAINED BY INTRUSION OF RIGHT TO
            PRIVACY

Anchorage police officer, James ESTES, admits to the intrusion of the Petitioner's privacy rights of his person, house, papers, and effects.

ESTES claims to be an expert in the field of www.internet use.  Therefore, he should have known or knew about internet users' right to privacy.  The chats between ESTES and the Petitioner were "private messages"; "private one-on-one chats"; using "private chat windows".  ESTES's sworn affidavit admits, in part:

"Yahoo is a primarily an internet based company that provides various web based services.  Some of these services they provide are email, fantasy sports, dating, search engines and Yahoo Messenger.  I know from experience that Yahoo Messenger allows users to communicate with other users from all over the world...Once in the public chat rooms the user can send a "private message" to other users in the room requesting a "private one-on-one chat".  Inside these "private chat windows" the user can instantly text chat, share photos, web cam, with each other and add each other as friends... Depending on what version of Yahoo Messenger the user had installed determines if the chats are archived on the user's computer or digital device (i.e., smart phones) or on Yahoo servers."  [emphasis added].

It is clear from ESTES's affidavit that he knows about privacy rights of users on the www.internet services, and has decided to conceal it in this case.

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 10 of 35

The public has been informed by newspaper, i.e., Anchorage Daily News, about stalking, cyber-spying, electronic surveillance, fake accounts, fake user ID's, and privacy on the internet services. One article by Dr. Lynne Curry, dated February 18, 2013 informs in part:

"FRIENDS ON FACEBOOK THEN FIRED FOR COMMENT
Q--I didn't realize my supervisor had linked to my Facebook profile. She made up an assumed name and profile and befriended me and two other employees who she perceived as troublemakers but who left the company months ago. This came to light last Friday when I got fired.
A--If your supervisor accompanied this "cyber-spying" with other actions and truly "stalked" you, call the police...A loophole in Facebook's "privacy settings" makes Facebook "stalking" hard to track or stop. Although Facebook tries to crackdown on pseudonyms, its organizers admit that more than eighty-three (83) million fake accounts exist.

Given what you've discovered, you have recourse. Report your former supervisor to Facebook and they'll pull down your supervisor's profile. Speak to the manager above your supervisor and document this "creepy behavior." When you do, your supervisor may join you in the unemployment line or the manager may recind your firing. If this supervisor accompanied this "cyber-spying" with other actions and truly "stalked" you, call the police." [emphasis added].
Detective James ESTES admits to using a fictious name in his sworn affidavit which accompanied the arrest warrant.

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 11 of 35

The February 25, 2013 Anchorage Daily News newspaper article informs the public about "NEWEST FORM OF STALKING IS ONLINE-- FBI PROBING ELECTRONIC DOMESTIC VIOLENCE" reported by Eric Hortley of the Los Angles Daily News, in part:

"Los Angles - Marieanne MADDALENA thought she was going crazy. Family members stopped talking to her for no apparent reason. People knew things she'd said only in "private email," including details of business deals.  Her boyfriend told her things her coworkers said about her.

She started to wonder if her phones were tapped or she was being watched.

Her psychiatrist, Dr. Lynn LERMAN, later testified MADDALENA had all the signs of paranoia.  "In fact, it really wasn't paranoia," LERMAN said, "it was true."

The FBI found the Suburban Studio City film producer was the "victim" of a year long campaign  of what a prosecutor called "Electronic Domestic Violence"...

Derrick TOOLE...she dated on and off for a few years, had secretly installed tracking software on her computer in 2010.

For a year he saw every email she sent and everything she goggled.  He had Facebook passwords and bank statements.

...When MADDALENA discovered the invasion in 2011, she said, "I realized he had everything."

TOOLE was arrested last  year, pleading guilty to FELONY COMPUTER CRIME charges and is on five year probation.  In January, the 48 year old spent almost a week in jail for violating probation...

...Jonathan FAIRLOUGH, who prosecuted TOOLE and spent more

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 12 of 35

than a decade in the Los Angles county district attorney's high technology crime division, said such crimes are becoming more common.

TOOLE's case was extreme in how long it went on...Hacking used to be the province of computer geeks, who often target government or business institutions for political or economic reasons or to show off their skills.

"Now we're seeing a shift to more attacks that are personal," FAIRLOUGH said.

Such attacks can be motivated by revenge, greed, or jealousy. And they're hard to prevent.

What TOOLE did was illegal...TOOLE...was no computer expert. "but now you can watch a You-Tube video and learn how to do it," FAIRLOUGH said.

...MADDALENA contacted attorneys who got the FBI involved...

When FBI agents searched TOOLE's...home in September 2011 they found a tub full of documents: bank statements, phone bills, user names and passwords of MADDALENA's friends, TOOLE's notes about where MADDALENA had been at certain times and who phone numbers might belong to...

In August, TOOLE pleaded guilty to charges of ILLEGALLY ACCESSING COMPUTER DATA AND UNAUTHORIZED MONITORING OF COMMUNICA- TIONS. In sentencing him, Superior court judge Joseph BRANDOLINO called his behavior "SOCIOPATHIC."

Marc Beaart, a supervisor in the DA's HIGH TECHNOLOGY CRIME DIVISION...Jim Kollar, A Deputy Special Agent in chage for the U.S. Secret Services's Los Angles office." (end)

Ground 6.   VIOLATION OF RIGHT TO SPEEDY TRIAL

On April 5, 2013, Judge Michael R. SPAAN asked the Petitioner:
"Are you going to inform the trial jurors about the UCC?"  The
Petitioner replied:  "Yes, your honor, in order for me to have
a fair trial I must inform the trial jurors about the Uniform
Commercial Code 1-308, the system of law the State of Alaska
operates under."  That ended the court hearing.

Judge SPAAN's order for Examination for June 10, 2013, using
AS 12.47.100 as his  authority is only to delay Petitioner's
right to a speedy trial.  On April 5, 2013, Judge SPAAN's court
hearing was only to find out if the Petitioner was going to inform
the trial jurors of the UCC.  The examination lasted about an
hour and fifteen minutes.

Judge SPAAN also set a new trial date to June 24, 2013 from
April 8, 2013 without the Petitioner's consent.  And, violating
the Anchorage Superior Court's directive pertaining to unnecessary
delays of felony trials coinciding with 120-day rule to take
felonies to trial and rule 43.

On May 21, 2013, the competency exam was had by Lois MICHAUD,
PhD of the Alaska Psychiatric Institution, which favored the
Petitioner disproving Judge SPAAN's claim the Petitioner was
incompetent to represent himself as the Judge SPAAN's judicial
determination of December 14, 2012 is valid that the Petitioner
can represent himself.  MICHAUD's exam was questions pertaining
only to court procedures and trying to find out his defense
strategy which Judge SPAAN was trying desperately to find out in
at least three to four court hearings before the April 8, 2013

14 of 33

trial date. The competency examination was of confidential nature and the Petitioner did not give his consent to MICHAUD to release her findings to Judge SPAAN. Thus, violating patient/doctor confidentiality.

The Petitioner happened to find a business card from the Public Defender Agency and on the back is written "projected trial 3/5/13". Judge SPAAN and the prosecutor had calculated Petitioner's 120-rule to take him to trial with different commence dates of the trial date.

Judge SPAAN and the prosecutor, Marika ATHENS, had calculated the speedy trial date using arraignment dates, etc., and not the correct commencing date as rule 45 instructs.

<u>Ground 7</u>. CONVICTION OBTAINED BY ACTION OF A GRAND JURY
NOT PROPERLY CONDUCTED BY PROSECUTOR

Grand jury not properly conducted by prosecutor in that she with-held pertinent information from the grand jurors. A lady had asked her if the police were watching the accused closely con-cerning the "victim". The prosecutor did not answer her question, steering away from confessing that there is "no victim" in this case. Only one witness, Detective James ESTES, who made the accusation, had testified during the grand jury proceedings. No one else is involved in this matter.

The prosecutor had read the charging statute in such a manner that confused the grand jurors reading it too fast and it read too voluminous and stating that it was almost lunch-time.

Another grand juror had been confused by the prosecutor when he asked can the accused get the same information that the police had. The tone of his voice was that he was unsure of

15 of *33*

himself in asking the prosecutor questions.

You are free to do anything you please, as long as you do not infringe on the life, liberty, or property of someone else. The common law does not allow for any government action which prevents a man from making a fool of himself. The lady grand juror had asked a question of the prosecutor that was pertinent to this matter ("case") in which the prosecutor did not answer because she knew there is no injured party in this case.

Ground 8. CONVICTION OBTAINED BY USE OF COERCE CONFESSION

On November 13, 2012, the Anchorage Police Department invaded the accused's residence at Palmer, Alaska. Without showing or given the search warrant, or arrest warrant, he was taken to a police vehicle and interrogated by two APD officers. They had said this questioning pertained to concerned parents. The accused did not believe the accusation and felt confused and panicky. One of the officers sat in the back not exposing himself, but was the main one doing the interrogation.

Ground 9. RIGHT TO REASONABLE BAIL VIOLATED

Upon arraignment (1st), excessive bail by the judge had been imposed, a twenty-five thousand dollar bail, cash/corporate, and third party custodian. The accused could not afford such bail.

On 11-30-12, a bail review hearing was had. The accused's court-appointed lawyer, had informed him that if the plea offer given by the prosecutor on 11-16-12 was not accepted, the bail review hearing would be vacated. Third party was present. The bail review hearing was vacated. The court-appointed lawyer was not present at this bail review hearing. Law of discovery ignored.

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 16 of 35

The arrest of the accused was on 11-13-12, plea offer was in letter form dated 11-16-12. The accused received a letter admitting discovery was not been had yet on 11-26-12, from his court-apointed lawyer.

Judge Michael R. SPAAN had refused to entertain the accused's MOTION FOR BAIL REVIEW HEARING dated 12-30-12, ordering him to use the State's new bail hearing form. This form was not yet distributed as the effective date of this form to be used was January 1, 2013.

Presumption of innocence, the undoubted law, had been ignored due to the extreme biased accusation.

Ground 10. CONVICTION OBTAINED BY ENTRAPMENT
The crux of this matter ("case") against the Petitioner is entrapment based on intrusion of his right to privacy by cyber-spying, stalking, electronic surveillance from: "Between December 6, 2011 and October 28, 2012." However, during the evidentiary hearing of Febraury 22, 2013, James ESTES, a detective employed by the Municipality of Anchorage Police Department (APD) Cyber Crimes Unit, had altered his sworn affidavit coached by the prosecutor, to change the October 28, 2012 date to November 10, 2012.

The Petitioner resided in the MAT-SU valley, i.e., Wasilla and Palmer, Alaska during the above dates, outside the Anchorage Police Department's geographical jurisdiction to operate.

The accusation was made by an APD officer on a sting operation on the www.internet services, Yahoo Messenger Alaska chatroom. This sting operation was mentioned by his court-appointed lawyer.

17 of 33

There is no one else involved in this matter ("case") but APD officer ESTES chatting in the Yahoo Messenger Alaska chatroom.

Nothing ever occurred or happened except the chatting episodes during this lengthy eleven-month period, i.e., such as meeting personally even when ESTES used words such as: "i trust u"; "i glad i make u happy"; "our secret"; you look nice"; "yes i can't believe u forgot me"; "kwel"; etc. The accused's counsel had referred to the chatting as "role-playing" between two consenting adults.

To further induce the Petitioner to continue chatting even detective ESTES knew the Petitioner was outside his police jurisdiction, he admits in his affidavit, in part:

> "During the course of me chatting with xxx he requested
> me to send him images of myself which I did. I sent him
> two fully clothed undercover photos of current Anchorage
> police officer Bergmen when she was approximately 14 years
> old."

There was no evidence of predisposition on the part of the accused presented in the case even though the length of the stalking, cyber-spying, electronic surveillance by APD     James ESTES was extreme in length. And, by continuing chats with the accused on a "one-on-one private" basis and sending "images" constitutes inducement to continue the chatting episodes.

The Petitioner has no sex offenses in his criminal history, however, in checking his criminal history judge SPAAN had inquired about a "homicide" that was reported in the Petitioner's criminal history in which never occurred. The judge also attempted to

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 18 of 35

"speak candidly" with the accused in a normal fashion, i.e., not judge to defendant; the judge actually asked the accused to do this, attempting to find out the accused's defense strategy.

The Petitioner had received Judge SPAAN's "Memorandum Decision Regarding Entrapment Defense" dated 03-13-13. Petitioner did not submit his entrapment motion for dismissal at all. Judge SPAAN had taken the role as a prosecutor, in which in itself, constitutes judicial misconduct. He also prevented the Petitioner from introducing evidence tending to establish a defense, the judge made a mixed determination of facts (i.e., what happened) and the law (it is legal?), this is totally unfair and biased.

The objective theory of entrapment law in Alaska is challenged here as with the charging statute. (end)

Ground 11. INEFFECTIVE ASSISTANCE OF COUNSEL
Attorney Lindsay Van GorKom was court-appointed to assist the accused in this matter ("case").

1) She had proved to be dishonest about matters in this case. When asked about the charging statute and to explain it in plain english, she just "read" it. Then she was asked where in this statute does it authorized law enforcement officials to lie in any way, shape or form? She immediately replied: "You can't use that as a defense!" She said that the evidence was strong against me. She had mentioned that the evidence was obtained in a sting operation by the Anchorage Police Department (APD). Then mentioned that it's just "role-playing" between two adults. Clearly she had read the affidavit of APD officer James ESTES....noting that there is no injured party.

19 of *23*

2) On 11-16-12 the prosecutor's pleas offer was read to me over the phone. She told me that a copy would be mailed to me. She told me to think about it before I give my answer.

On 11-29-12, between 9:20 am and 9:26am, I talked, by phone, to Van GorKom requesting she set up a bail review hearing.

At 4:40 pm, 11-29-12, a lawyer-client visit was had and discussed prosecutor's proposed plead bargain——told me evidence against me was strong, and told me if I don't accept this plea offer, the bail review hearing would be vacated. She said that was the stipulation.

On 11-30-12, baild review hearing was had. Van GorKom was not there. Another lawyer was there, he said was representing me. I expected Van GorKom to be there. This unknown lawyer told me that the stipulation Van GorKom gave me still stand that if I don't accept prosecutor's plea offer, then the bail review hearing would be vacated. My third party was there. I did not accept this plea offer, and the bail review hearing was VACATED.

3) Van GorKom had advised me not to attend the (1st) scheduled preindictment hearing telling me that it would do me no good. I did not attend. I later protested this. She had told the judge that I chose not to attend when the judge asked where is the defendant? She lied to the judge and should have told him that: "she had advised the defendant not to attend."

On 12-06-12, a (2nd) preindictment hearing was scheduled. It was confusing to me. Van GorKom advised me to agree to a rule 5 hearing telling me that it would give the State 10 days to indict me. Next court date she said would be on 12-17-12.

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 20 of 35

4) On 12-14-12, a second arraignment hearing was had.
I was not allowed to speak to the judge. Van GorKom was not
there. When I attempted to get the judge's attention by waving
my arms, a police officer noticed me then came to me and asked
what the problem was. I told him politely that I needed to adddress
the court, he immediately told me "I can't do that." He waved
to the public defender that I wanted to address the court, he
told me that I can't, but he will. He asked me why I needed
to talk to the judge, I started to answer, but he abruptly
interrupted and asked: "do you want to dismiss your lawyer for
conflict of interest?" This I did not say. I replied: "Yeah,
that too." He went back to the place he came from. He then
asked the judge to schedule a representation hearing, it was
scheduled for 12-18-12.

5) During one of the lawyer-client visits, Van GorKom had
another lawyer with her (he looked like the lawyer who told me
he was representing me at the 11-30-12 bail review hearing). I
asked her who was this guy? Before she answered I told her to
get rid of him saying he's not my lawyer, you are! She argued
that he was and tried to show me where the "public defender agency"
was also court-appointed to represent me along with her. She
yelled at me then I walked out.

6) On 12-14-12, Van GorKom was dismissed as my court-
appointed counsel during the representation hearing for fraud-
ulently representing her client and dishonesty. Judge SPAAN
had really praised her, saying she was an excellent attorney
and she does very satisfying work as a lawyer. I just listened

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 21 of 35

to what he said without responding. After he was done praising
Van GorKom as a lawyer who does good work, I mentioned to him
about the plea offer the prosecutor gave her to present to me
on 11-16-12. I had learned by that time, that by law a plea
offer is not required before the rule of discovery. The plea
offer was in writing dated 11-16-12, Van GorkKom sent me a letter
dated 11-26-12 informing me that she have not received discovery
in my case yet.

Judge SPAAN had asked her during this hearing if the plea
offer incident happened, Van GorKom said a quiet "no", thus,
lying to him in open court. During out initial lawyer-client
visit she had advised me "not to admit to anything", this I
distinctly remember, when we were discussing the matter against
me. She took her own advice then.

Ground 12. UNFAIR SENTENCING HEARING VIOLATION OF DUE
PROCESS RIGHT

Sentencing hearing on September 26, 2013 was totally unfair
in that the judge had asked the defendant if he had a statement
to make, defendant said "yes". After reading the statement in
part, the judge had declared it to be 'irrelevant' because he
did not like what he heard of the defendant's statement up to that
point. Prosecutor Marika ATHENS was not present.

First, another prosecuting officer had informed the judge
that she was not at the trial and had briefly talked with the
prosecutor about it, but she still was not fully aware what
happened during the trial and she kept stating that she does not
know what occurred at the defendant's trial. In a roundabout

22 of <u>33</u>

way the judge refused to answer or inform her of the trial.

Defendant had first stated "Prosecutor's Job", i.e., the truth - to help in the attainment of justice; recognized that a miscarriage of justice is being sought by officials too irresponsibile, or too cowardly to admit the error that had been made; defendant's victimized by corrupt policemen; overly ambitious prosecutors or prejudice judges by instances of misbehavior by those sworn to uphold the law; some of the authorities are not truly concerned about seeing that justice is done.  So long as the police and 'their defenders within the State's attorney system could insist on the accused's undoubted guilt to them, so long would the magnitude of their mistake is DISGUISED. [The civilized people in the world, the ones who hide behind culture, and art, and politics——and even the law, they're the ones to watch out for.  They've got that perfect DISGUISE going for them, you know?  But they're the most vicious.  They're the most danger-ous people on earth.]  I am stating facts in this case, emotions must be removed such as bias and prejudice because of the nature of the accusation which is of extreme bias.  And, that's all this case is based on....an accusation!

One can depend on the prosecutor to be unfair, devious, fraudulent, and conniving in their efforts to "win".

Exaggeration, false premises, and false conclusions are the primary tools of the prosecutor as evidented in this matter.  And, they will interrupt while you are talking  what the judge did—— stopping the defendant to continue his sentencing statement).

Also mentioned was "evidence obtained pursuant to an invalid

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 23 of 35

arrest/search warrant.

The defendant had read his NOTICE OF RESERVATION OF RIGHTS under the Uniform Commercial Code 1-308, which was ignored.

And, had presented his MOTION TO DISMISS and to vacate the sentencing hearing on the grounds of a monopoly of unconstitutional proportion under the Alaska BAR Association and its BYLAWS; Alaska Rule of Court; United States CONSTITUTION and its laws; see 18 U.S.C.S. § 5212.

As witnesses to this unconstitutional sentencing hearing was a different prosecutor, probation officer, and the court stenographer.

The defendant did not understand the judge's sentencing because of the confusion the new prosecutor instigated here. All the defendant recalls is the judge saying he agreed to the other stipulations of the defendant's sentence, which one stipulation was, in part: NOTICE TO DEFENDANT——Sex offender...Registration Requirement...for life...AS 11.61.128 Distribution of indecent material to minors. This charge does not apply. The defendant was railroaded in this case. It is clear that the judge was far from being impartial and that he had aided the prosecutor in obtaining this conviction in which the charging Alaska statute does not apply and there was insufficient evidence to support such a charge., i.e., no injured party. COMMON LAW JURISDICTION.

Some judges apply an unwritten and unfair jury trial penalty policy, giving harsher sentences to defendants who opted for a jury rather than a judge trial, for example, an off-record conversation, judges often tell defense attorneys something like,

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 24 of 35

"if your client takes a bench (judge) trial and is convicted, he's looking at a couple of years in jail. But if he insists on a jury trial, all bets are off." The implication is that defendants who put the system to the added time and expense of a jury trial will pay for it in their sentences.

The defendant had reminded the judge that the defendant had a witness who was supposed to testify about the illegal search and seizure the APD/AST had conducted. The witness was not there to testify. The defendant believes the judge set the sentencing hearing to be closed to the public in a deceitful manner. The judge even had asked the defendant about the status of the defendant and his reliable witness' relationship during this sentencing hearing.

The defendant has the right as a prisoner to contact his family by telephone even when his status is indigent, and cannot afford long distance telephone calls. The defendant, even after the sentencing hearing, had been denied to call his family by prison officials to date. The judge during trial, had told the defendant that: "it's your responsibility to contact and let the witness know when the sentencing hearing is." The defendant had written a letter to the witness but it was "returned". The defendant believes prison officials did not actually mailed his letter because the "returned mail" did not have the proper markings of postal mail being returned by the post office. In fact, the defendant got his "returned letter" after September 26, 2013. Cop-outs to call his family had been denied. The defendant had called his witness once when he gave the telephone number and

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 25 of 35

it was dialed, but it was in the month of August without being
hasseled by prison officials.

Note:  The court stenographer had the defendant's statement
copied (she suggested that herself to the judge for the record).(end)

Presumption of Correctness. 28 USCS § 2254(e)(1).  Mandate
of 28 USCS § 2254 that federal court presume that finding of fact
made by the state court are correct does not mean federal court
invariably accept state court's factual findings as true beyond
question.  Dickerson v. Fogg, (1982, CA2 NY) 692 F2d 238.

Indeed, claims challenging the validity of a prisoner's
continued incarceration, including the fact or length of the
custody, lie within the "heart of habeas corpus" and are conizable
only in federal habeas corpus."  Preiser v. Rodriguez, 411 U.S.
475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

When a state prisoner was challenging the very fact or
duration of his physical imprisonment, and the relief he sought
was a determination that he was entitled to immediate release
or a speedier release from that imprisonment, his sole federal
remedy was a writ of habeas corpus.  Preiser v. Rodriguez, supra.

The writ of habeas corpus is a remedy available to effect
discharge from any confinement contrary to the U.S. Constitution
or fundamental law, even though imposed pursuant to conviction
by a court of competent jurisdiction.

In this immediate case, the state court did not have competent
jurisdiction to seek prosecution of Mr. Mendenhall as their was
no injured party, only an extreme bias accusation made.

Whether a habeas corpus petitioner's challenge to his custody

26 of _33_

is that the statute under which he stands convicted is unconstitu-
tional; that he has been  imprisoned prior to trial on account of
a defective indictment against him;...that he was denied his
constitutional rights at trial or that his parole was unlawfully
revoked, causing him to be reincarcerated in prison--in each case
his grievance is that he is being unlawfully subjected to physical
restraint, and in each case habeas corpus is accepted as the
specific instrument to obtain release from such confinement.

The federal habeas corpus statute does not deny the federal
courts power to fashion appropriate relief other than immediate
release.  Since 1874, the habeas corpus statute directs the
courts to determine the facts and dispose of the case summarily,
as law and justice require.  28 USCS § 2243.

Once a state prisoner arrives in federal courts with his
petition for habeas corpus, the federal habeas statute provides
for a swift, flexible, and summary determination of his claim.
28 USCS § 2243.

In the context of state law in relation to federal
constitutional rights, it is no answer that the state has a law
which if enforced would give relief.  The federal remedy is
supplementary to the state remedy, and the latter need not be
first sought and refused before the federal one is invoked.

Petitioner challenges two Alaska state statutes, i.e., AS
11.61.128, Distribution of indecent material to minors; in which
no minors are involved in this case against him. This statute
contradicts itself---compare sections (a)(1)(B)another person

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 27 of 35

that the person believes is a child under 16 years of age; and

(b) In this section, it is not a defense that the victim was not actually under 16 years of age.

Where in this state statute does it gives authorization to any law enforcement officials to lie in any way, shape, or form?

District court judge may not defer to state court's finding of law on habeas corpus petition, it is the duty of federal judge to apply the federal law to state court fact findings independently. Mendenhall v. Hopper, (1978, SD GA) 591 F.2d 1342.

The second challenged Alaska law is the entrapment statute § 11.81.450. Alaska has adopted the "objective" test for determining whether entrapment has occurred. The objective test requires the court to focus upon the conduct of the police. The question is whether that conduct falls below an acceptable standard of the fair and honorable administration of justice.

Alaska employs an objective test for entrapment. This means that the court considers the nature of the police activity involved without reference to the predisposition of the defendant.

The United State SUPREME COURT has given three examples of when a federal enactment precludes application of a state law under the Assimulated Crimes Act, 18 U.S.C.S. § 13: (1) application of the state law would interfere with the achievement of a federal policy; (2) application of the state law would effectively rewrite an offense definition that Congress carefully considered; (3) the federal statutes reveal an intent to occupy so much of a field as would exlude use of the particular state statute at issue. United States v. Rocha, 598 F3d 1144, 2010 U.S. App. LEXIS 5603 (9th Cir.

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 28 of 35

Cal. 2010).

Fed.R.Crim.P. 29(a) states that after the government closes its evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.

In the trial, it was a farce and a sham by conduct of the judge and prosecutor, there was obvious collaboration that the defendant actually witnessed as he was defending himself, pro per.

The United States Supreme Court has leaned heavily on the "subjective" evaluation of entrapment. See United States vs. Jacobson, 503 U.S. 540, 112 S.Ct. 1535 (1992). Inducement is an issue in this case. See Affidavit of Anchorage Detective James ESTES. Under the objective evaluation of entrapment it might violate an accused's rights. The...issue is whether the Government carried its burden of proving that petitioner was predisposed to violate the law before the government intervened..."when the Court wrote that the Government may not punish an individual "for an alleged offense which is the product of the creative activity of its own officials" and that in such a case the Government "is in no position to object to evidence of the activities of its representatives in relation to the accused. Sorrell v. United States, 287 U.S. 433. Indeed, the proposition that the accused must be predisposed prior to contact with law enforcement officers is so firmly established that the Government conceded the point at oral argument, submitting that the evidence it developed during the course of its investigation was probative because it

29 of 3̲3̲

indicated petitioner's state of mind prior to the commencement of the Government's investigation. See Tr. of Oral Arg. 41, 49.

Law enforcement officials go too far when they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute. See ARREST WARRANT and AFFIDAVIT OF JAMES ESTES.

State superior court judge Michael R. SPAAN had actually denied Mr. Mendenhall's defense of entrapment without even seeing his MOTION TO DISMISS based on entrapment. Thus, SPAAN had acted in the capacity of a prosecutor. This denial by SPAAN occurred on or about 3/13/13. Mr. Mendenhall had also submitted a MOTION TO DISMISS lacking corpus delicti and jurisdiction.

Uniform Commercial Code § 1-101 (all states) Proof of corpus delicti, to be sure, entrapment cannot be available as a defense unless a crime by the object of the entrapment is established, since if there is no crime there is nothing to defend against; but in all sense all affirmative defenses assume commission of the crime.

The 9th Circuit has expressly found that the habeas corpus statute of limitations set forth in 28 U.S.C. § 2244(d) is subject to a "fundamental miscarriage of justice" exception. See Lee v. Lampert, 633 F.3d 929, 937 (9th Cir. 2011) (en banc). The Supreme Court has held that for the "fundamental miscarriage of justice" exception to apply, the petitioner must show that a constitutional violation probably has caused the conviction of one who is actually innocent of the crime. Schlup v. Delo, 513 U.S. 298, 324 (1995); see also, Lee, 653 F.3d at 937-38.

30 of *33*

The civilized people in the world, the ones who hide behind culture, and art, and politics....even the law, they're the ones to watch out for. They've got the perfect disguise going for them, you know? But they're the most vicious. They're the most dangerous people on earth.

An evidentiary hearing is warranted in this matter because of ample claims of federal guaranteed constitutional rights are alleged to be violated by the state courts of Alaska. No response from Respondent in this matter of the Petitioner's detention have been made.

28 U.S.C.S. § 2243 provides: A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.

The writ, or order to show cause shall be directed to the person having custody of the person detained. It shall be returned within (3) days unless for good cause additional time, not exceeding twenty days, is allowed. The person to whom the writ or order is directed shall make a return certifying the true cause of the detention.

When the writ or order is returned a day shall be set for hearing, not more than five days after the return unless for good cause additional time is allowed.

Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 31 of 35

be required to produce at the hearing the body of the person detained.

The applicant or the person detained may, under oath, deny any of the facts set forth in the return or allege any other material facts.

The return and all suggestions made against it may be amended by leave of the court, before or after being filed.

The court may summarily hear and determine the facts, and dispose of the matter as law and justice require.

The United States Supreme Court has held clearly and repeatedly that any judge who acts without jurisdiction engaged in treason. There is at least seven state judges involved in this case against Mr. Mendenhall.

Unconditional releasing petitioner and barring reprosecution because combination of "outrageous" prosecutorial malfeance" and court's finding that petitioner has satisfied "actual innocence" standard would render reprosecution "a constitutional intolerable event." Lambert v. Blackwell, 962 F.Supp. 152 (ED Pa 1997).

UNCONDITIONAL RELEASE. Foster v. Gilliam, 116 S.Ct. 1 (1995) (mem.)(Rehnquist, Circuit Justice)(denying stay of district court order that enjoined second trial of petitioner's pending court of appeal's review of grant of writ on double jeopardy grounds). See D'Ambrosio v Bagley, 656 F.3d 397 (F.R.Civ.P. 60(b).

REQUEST RELIEF. I, Michael Mendenhall, request unconditional release in this matter.

Michael Mendenhall

1400 E. 4TH Ave

Anchorage, AK 99501

Case 3:14-cv-00001-RRB   Document 7   Filed 08/18/14   Page 32 of 35

DECLARATION UNDER PENALTY OF PERJURY

I understand that a false statement or answer to any question in
this declaration will subject me to penalties of perjury. I
**DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED
STATES OF AMERICA THAT THE ABOVE STATEMENTS ARE TRUE AND CORRECT.**

Executed at: Anchorage, Alaska                    Date: _6-13-14_

_Michael Mordenhall_                              _888_
Signature of Petitioner                           Inmate number

_Chris P. Scarberry_
_Commission Expires with Office_
_Date   13-Fun 2014_

33 of _33_

## CERTIFICATE OF SERVICE

I certify that I mailed (by first class mail) or hand-delivered a copy of this motion to:

    D. MILLER
    Superintendent
    Anchorage Corrections  Complex
    1300 E. 4th Avenue
    Anchorage, Alaska 99501

8-14-14

Signature of Person Filing Motion



Michael Mendenhall JP

~~Hope Eldridge~~ Goose Creek Correctional Center
~~Anchorage Corrections Complex~~ PO Box 877790
~~Anchorage AK 99501~~ Wasilla, Alaska 99687

neopost
08/15/2014
US POSTAGE
FIRST-CLASS MAIL
$02.24⁰
ZIP 99654
041L11229247

United States District Court
222 W. 7th Avenue
#986
Anchorage, AK 99501
Attn: Clerk of Court